**RECORD NO. 11-2089 (L) and 11-2141**

## IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

**BEST MEDICAL INTERNATIONAL, INC., a Virginia Corporation;
BEST VASCULAR, INC., a Delaware Corporation,**
*Plaintiffs-Appellants,*

v.

**ECKERT & ZIEGLER NUCLITEC GMBH,
a German corporation, successor to QSA Global GmbH,**
*Defendant-Appellee.*

_____

**OPENING BRIEF OF PLAINTIFFS-APPELLANTS**

**ON APPEAL FROM THE UNITED STATES
DISTRICT COURT FOR THE EASTERN DISTRICT
OF VIRGINIA AT ALEXANDRIA**

**James Michael Brady (VSB No. 80002)**
**BEST MEDICAL**
 **INTERNATIONAL, INC.**
**7643 Fullerton Road**
**Springfield, Virginia 22153**
**(703) 451-2378 (Telephone)**
**(703) 451-8421 (Facsimile)**
james@teambest.com

**Counsel for Plaintiffs-Appellants -**

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ......................................................... 1

I.  JURISDICTIONAL STATEMENT .................................................. 1

II.  STATEMENT OF ISSUES .............................................................. 2

III.  STATEMENT OF THE CASE.......................................................... 2

IV.  STATEMENT OF FACTS .............................................................. 3

    A.    PROLOGUE ............................................................................... 3

    B.    THE PARTIES OBLIGATIONS UNDER THE SETTLEMENT AGREEMENT ..... 5

    C.    ALTHOUGH BEST TOOK THE NECESSARY STEPS TO CARRY OUT THE D
        & D, DEFENDANT'S FAILURE TO COOPERATE PREVENTED BEST FROM
        COMPLETING THE D & D ...................................................... 9

V.  SUMMARY OF THE ARGUMENT ............................................. 26

    A.    EQUITABLE ESTOPPEL SUMMARY ........................................... 26

    B.    SUMMARY OF CONTRACT CLAIMS .......................................... 29

VI.  ARGUMENT .................................................................................. 32

    A.    STANDARD OF REVIEW ...................................................... 32

    B.    DID THE DISTRICT COURT ERR IN GRANTING EZN'S MOTION
        FOR SUMMARY JUDGMENT ON PLAINTIFFS' EQUITABLE
        ESTOPPEL CLAIM? ..................................................... 32

        1.    EZN's Representations and Actions ........................................... 37

        2.    Best Relied on EZN's Representations and Actions ..................... 39

        3.    Best Changed Their Position In Reliance on EZN's Statements and
            Conduct ................................................................... 40

        4.    Best was Detrimentally Harmed ................................................ 42

    C.    DID EZN COOPERATE WITH BEST IN THE PERFORMANCE OF
        THE D & D OBLIGATION AS REQUIRED BY THE SA? ............. 43

I

D. COULD BEST BE IN DEFAULT WHEN G.E. HAD NOT APPROVED THE D & D PLANS AND THE D & D COULD NOT COMMENCE WITHOUT SUCH APPROVAL? .............................. 50

E. DID THE SA REQUIRE EZN TO PROVIDE BEST WITH IN SPECIFICATION SOURCE TRAINS? ........................................... 52

F. DID EZN HAVE THE RIGHT TO DESTROY BEST'S PRODUCTION LINE? .................................................................... 54

VII. CONCLUSION........................................................................... 56

CERTIFICATE OF COMPLIANCE WITH RULE 28.1(E) OR 32(A) ................ 58

CERTIFICATE OF SERVICE............................................................. 59

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) ............................................. 32

*Atlantic Coast Line Railroad Co. v. Bryan,* 109 Va. 523, 526, 65 S.E. 30, 31 (1909) ............................................. 36

*Barry v. Donnelly,* 781 F.2d 1040, 1042 (4th Cir. 1986) ................... 34

*Bender-Miller Co v. Thomwood Farms, Inc.,* 211 Va. 585, 179 S.E.2d 636, 639 (Va. 1971) ............................................. 58

*Boggs v. Duncan,* 202 Va. 877, 882, 121 S.E.2d 359, 363 (Va. 1961) ........... 47

*Datastaff Technology Group, Inc. v. Centex Construction Co., Inc.,* 528 F.Supp.2d 587, 593 (E.D. Va. 2007) ............................ 33

*Higgins v. E.I. Du Pont de Nemours & Co.,* 863 F.2d 1162, 1167 (4th Cir. 1988) ............................................. 32

*Elliott v. Sara Lee Corp.,* 190 F.3d 601, 605 (4th Cir. 1999) .............. 32

*Employers Commercial Union Ins. Co. of America v. Great America Ins. Co.,* 214 Va. 410, 200 S.E.2d 560, 562 (Va. 1973) ................... 34

*Galvin v. Southern Hotel Corp.,* 154 F.2d 970, 973 (4th Cir. 1946) (internal citations omitted) ............................................. 59

*Gitter v. Cardiac & Thoracic Surgical Associates, Ltd* ............. 37

*Gitter v. Cardiac & Thoracic Surgical Assocs. Ltd.,* 419 Fed. Appx. 365, 369 (4th Cir. 2011) ............................................. 34

*Gross v. SES Americom, Inc.,* 213 Fed. Appx. 166, 169 (4th Cir. 2007)(internal citations omitted) ............................................. 54

*Harris v. Woodrum*, 3 Va. App. 428, 350 S.E.2d 667, 669, 3 Va. Law Rep.1177 Va. Ct. App. 1986)................................................................................ 58

*Bank of Montreal v. Signet Bank,* 193 F.3d 818, 834 (4th Cir. 1999)(citations omitted) ........................................................................................... 38

*City of Bedford v. James Leffel & Co.,* 558 F.2d 216, 217-18 (4th Cir. 1977) ....... 37

*Meriweather Mowing Service, Inc. v. St. Anne's-Belfield, Inc.,* 51 Va. Cir. 517, 519 (Charlottesville 2000)....................................................................... 34

*Meriweather Mowing Service, Inc. v. St. Anne's-Belfield, Inc.,* 517 Va. Cir. 517,519 (Charlottesville 2000)................................................................. 39

*Palmer & Palmer Co., LLC v. Waterfront Marine Construction, Inc.,* 276 Va. 285, 289, 662 S.E.2d 77, 80 (2008)(internal citations omitted)............................. 46

*Paul Bruce, Inc. v. Gemini Asset Managers*, 35 Va. Cir. 372, 379 ....................... 35

*Pocahontas Mining Ltd. Liab. Co., v. CNX Gas Co., LLC*, 276 Va. 346, 666 S.E.2d 527, 531 (Va. 2008) ................................................................. 57

*Rambus, Inc. v. Infineon Technologies AG*, 326 F. Supp. 2d 721, 737 (E.D. Va. 2004) ......................................................................................... 33

*Rambus, Inc. v. Infineon Technologies AG, supra* ................................................ 38

*Re LCS Homes,* 103 B.R. 736, 743 (E.D. Va. 1989)............................................. 47

*RW Power Partners, L.P. v. Virginia Electric and Power Co.,* 899 F. Supp. 1490, 1496 (E.D. Va. 1995) ................................................................. 58

*Seaboard Air Line R.R. Co. v. Richmond-Petersburg Turnpike Auth.*, 202 Va. 1029, 121 S.E.2d 499, 503 (Va. 1961) ............................................... 58

*States ex rel. Humble Oil & Ref. Co. v. Fidelity & Casualty Co.*, 402 F.2d 893 (4th Cir. 1968)............................................................................... 36

*T. v. T.*, 216 Va. 867, 224 S.E.2d 148, 152 (1976)......................................... 35

IV

*Tidewater Beverage Services, Inc. v. Coca Cola Co., Inc.,* 907 F. Supp 943, 946 (E.D. Va. 1995) ........................................................... 35

*Tidewater Beverage Services, Inc. v. Coca-Cola Co., Inc.,supra* .......................... 38

*United States ex rel. Humble Oil & Ref. Co. v. Fid. & Cas. Co. of New York,* 402 F.2d 893, 897 (4th Cir. 1968) ......................................................... 33

*United States of America v. United States Fidelity & Guaranty Co.,* 133 Fed. Appx. 58 (4th Cir. 2005)........................................................ 39

**STATUTES**

28 U.S.C. § 1291 ........................................................................2, 35, 44

**REGULATIONS**

*Fed. R. Civ. P. 56(c).* ........................................................................ 32

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fourth Circuit Local Rule 26.1, Plaintiff-Appellant, Best Medical International, Inc., by its attorneys, states that it has no parent corporation. Best Medical International, Inc. does not issue stock. No publicly held corporation has a direct financial interest in the outcome of this litigation due to the participation of Best Medical International, Inc.

Best Vascular, Inc. is a qualified subsidiary of Best Medical International, Inc. Best Vascular, Inc. does not issue stock. No publicly held corporation has a direct financial interest in the outcome of this litigation due to the participation of Best Vascular, Inc.

/s/ _____,
JAMES M. BRADY, ESQ.

1

# I.    JURISDICTIONAL STATEMENT

The United States District for the Eastern District of Virginia possessed subject matter jurisdiction of this case pursuant to 28 U.S.C. which grants the district courts of the United States jurisdiction over any civil action where there is complete diversity of citizenship and the amount in controversy is at least $75,000.00. In this case, there is complete diversity of citizenship because Best Medical International, Inc. (hereafter "BMI") is a Virginia corporation and Best Vascular, Inc. (hereafter "BVI"; collectively BMI and BVI are referred to as "Best") is a Delaware corporation. APP000430, 1352. BMI has their principal place of business in Fairfax County, Virginia. APP000430. Eckert & Ziegler Nuclitec (hereafter "EZN") is a German corporation with its principal place of business in Braunschweig, Germany. APP000430, 1352.

On September 7, 2011, the Honorable Claude M. Hilton granted both Plaintiffs-Appellants' Motion for Summary Judgment as to Defendant's counterclaims and Defendant-Appellees' Motion for Summary Judgment and resolved all issues before the District Court. By Order dated September 7, 2011, the entire case was dismissed. APP0001369. Plaintiffs-Appellants timely filed a Notice of Appeal on October 7, 2011. APP0001370. Defendant-Appellees filed a cross-appeal on October 20, 2011. APP0001372. This Court now has proper

jurisdiction of this appeal pursuant to 28 U.S.C. § 1291, as the grant of final judgment in this matter constituted a final decision of the District Court.

## II. STATEMENT OF ISSUES

1. Did the District Court err in granting EZN's Motion for Summary Judgment on Best's Equitable Estoppel claim?

2. Did EZN cooperate with Best in the performance of the decommissioning and decontamination (hereafter "D & D") obligation as required by paragraph 3(c) of the Settlement Agreement?

3. Could Best be in default when G.E. had not approved the D & D and the D & D could not commence without such approval?

4. Did the Settlement Agreement require EZN to provide Best with in specification Source Trains?

5. Did EZN have the right to destroy Best's production line?

## III. STATEMENT OF THE CASE

This case involves interpretation of the parties' Settlement Agreement dated April 16, 2008 (hereafter "SA"), which resolved a lawsuit brought by EZN's predecessor, AEA Technology-QSA, GmbH (hereafter "QSA") against Best, and the parties' rights and obligations under the SA. On June 3, 2010, Best filed its Verified Complaint for Injunctive Relief and Ex Parte Motion for Temporary

2

Restraining Order in the District Court for the Eastern District of Virginia, Alexandria Division.   On June 15, 2010, the District Court entered an order denying Best's Motion for Temporary Restraining Order.  Best subsequently filed their Amended Complaint for Injunctive Relief on July 21, 2010.   APP000430-590. After effecting service on EZN in Germany in September, EZN answered Best's Complaint on October 7, 2010 and filed a Counterclaim against Best. APP000599, 612.   Best answered the counterclaim on December 3, 2010. APP000650. On March 14, 2011, both EZN and Best filed their Motions for Summary Judgment.   A hearing was held on or about April 11, 2011 in which Judge Hilton granted both Best and EZN's Motions for Summary Judgment and dismissed the case which was later entered into an Order dated September 7, 2011. APP0001369.

## IV.    STATEMENT OF FACTS

### A. Prologue

On October 14, 1999, Best's predecessor, Novoste Corporation, entered into a Source Manufacturing Agreement (hereafter "SMA") with QSA, EZN's predecessor, in which QSA was to manufacture Strontium 90 (hereafter Sr90) Jacketed Radiation Source Trains (hereafter "JRST's" or "Source Trains") to meet Novoste's commercial supply requirements under patents owned by Novoste. APP000458-512.   Paragraph 1.26 of the SMA defined "specifications" as those

3

specifications set forth in Schedule D of the SMA. APP000462. The SMA
provided that QSA would purchase or manufacture the production line and upon
completion, a warranty bill of sale would be completed transferring full title to the
production line to Novoste and that Novoste "shall at all times hold all right, title
and interest" in the production line. APP000466, ¶6.1, 1228 (Fritz Dep.) lines 3-
12. The production line was located at QSA's facility in Braunschweig, Germany.
APP000461, ¶1.10. QSA had the right to use the production line only for the
purposes of producing JRST's that met the specifications. APP000466, ¶6.1(i),
APP000469, ¶7.1. The SMA also provided that upon termination of the SMA, the
production line would need to be decontaminated which would be Novoste's
responsibility unless QSA exercised its option to acquire title to the production
line. APP000467, ¶6.1(iii).

QSA was required by the SMA to certify in writing that each batch of
Source Trains were produced and tested in compliance with the specifications and
all applicable laws of Germany, the European Union, and the U.S. APP000469,
¶7.1. The SMA did not require Novoste to accept or pay for out-of-specification
Source Trains. APP000475-476, ¶10.2 Upon termination of the SMA, Novoste
was required to purchase the minimum inventory stock held by QSA which was to
be made to specification. APP000476, ¶10.3. In November 2000, Novoste

4

obtained Premarket Approval of the Beta-Cath™ System from the U.S. Food and Drug Administration. APP00027-49.

On March 9, 2005, Novoste notified QSA in writing that Novoste did not wish to extend the term of the Agreement beyond September 15, 2006. APP00050.   Thereafter, Best acquired the assets of Novoste pursuant to an Amended and Restated Asset Purchase Agreement dated October 12, 2005. APP00054-58.   QSA acknowledged Best's assumption of Novoste's vascular brachytherapy business on June 9, 2006.   APP00062.   Best's acquisition of Novoste's assets included the production line as Fritz Hohn acknowledged in 2007. APP00074.   EZN's parent corporation, Eckert & Ziegler Strahlenund Medizintechnik AG (sometimes referred to as "EZAG"), acquired all the stock of QSA on or about January 28, 2009.  APP000430.

On January 8, 2008, QSA sued Best in the Eastern District of Virginia, Alexandria Division, Civil Action No. 1:07-cv-408 alleging breach of contract. APP000431, ¶4.   That dispute was eventually resolved when the parties entered into a Settlement Agreement dated April 16, 2008.  APP000445-456.

## B. The Parties Obligations Under the Settlement Agreement

Pursuant to the terms of the Settlement Agreement (hereafter "SA"), Best was obligated to pay QSA €100,000 for the purchase of Source Trains containing 500 sources and provide QSA with Best's preference for the size of JRST's to

comprise Best's purchase. APP000446, ¶2. QSA was required to attempt to satisfy Best's preference for the size of the Source Trains but was to deliver to Best by July 10, 2008 Source Trains containing a minimum of 500 sources. APP000446, ¶2. If QSA was unable to deliver the JRST's, QSA was required to either provide the number of sources needed to cure the shortfall or refund Best €200 for each source short of 500 that was delivered. APP000446, ¶2. On April 15, 2008, EZN's inventory indicated they had eighteen 60mm Source Trains, fifty-five 40mm Source Trains, and forty-two 30mm Source Trains. APP000118. No sources were ever delivered to Best because a dispute arose regarding whether the JRST's had to be within the specifications set forth in the SMA. APP000146, 158-161, APP000694-695 (Reed Dep.) lines 3-22, 1-22. The SA provides that the Sources and Source Trains referred to in the SA "refer to radioactive Sources and Source Trains manufactured by QSA under the SMA." APP000446, ¶2, APP000692-693 (Reed Dep.) lines 14-22, 1-9. Best refused to accept JRST's. APP000160.

Pursuant to the SA, Best was required to post a performance bond in the amount of €200,000 to secure their obligation to decontaminate and decommission the Production Line (hereafter "D & D"). APP000447, ¶3(a). The SA further provided that if the D & D was not complete by April 16, 2009, Best could obtain

6

an extension of time up to 120 additional days to complete the D & D provided Best paid €50,000 per month for each 30 day extension. APP000447, ¶3(e)(i).

EZN was also required to post a performance bond in the amount of €200,000 to secure their obligation to accept the responsibility and costs associated with the decommissioning, storage, and disposal of the sources and Source Trains that Best returned to EZN from April 16, 2008 through April 16, 2012. APP000450, ¶4(a).

Paragraph 3(c) of the SA required EZN to cooperate with Best in the performance of its D & D obligation, including, but not limited to, providing Best and its authorized agents and contractors access to the facility when needed, access to personnel within EZN, and coordinating with G.E., the owner and landlord of the facility where the production line was housed. APP000447, ¶3(c).

Pursuant to the SA, ¶2, on May 21, 2008, Best's counsel, Susan Richards Salen (hereafter "Best's counsel" or "Salen") advised EZN's counsel, Lawrence Hirsh (hereafter "Hirsh") and Alan Howard (hereafter "Howard" (hereafter collectively referred to as "EZN's counsel") of Best's preference for 60mm Source Trains. APP000120. This information apparently was not conveyed to EZN because on May 29, 2008, Helmut Menuhr (hereafter "Menuhr") complained to Hugh Evans (hereafter "Evans"), QSA's Vice President and Director of Business Development, that they had not received any order from Best regarding which

7

trains Best wanted and where to ship them. APP000125. After further discussion between the parties regarding Best's preference, it was decided on June 13, 2008 that EZN would provide eighteen 60mm JRST's and four 40mm JRST's because EZN did not have enough 60mm JRST's left to fulfill the contractual 500 sources. APP000130, 135, 142, 136.

On May 28, 2008, Salen requested a 30-day extension for Best to comply with the Letter of Credit (hereafter "LOC") requirement.    APP000123, 792 (Weingast Dep.) lines 5-15.  EZN's counsel granted a ten-day extension to June 10, 2008. APP000124. On June 2, 2008 Shawn Weingast (hereafter "Weingast"), Best's in-house counsel, emailed Howard attaching confirmation of the minimum inventory payment wire of €100,000 which established Best's compliance with ¶2 of the SA regarding payment for minimum source inventory.  APP000127-128. Best took steps to comply with the Letter of Credit requirement of the SA including, but not limited to, providing Wachovia with the necessary information. APP000129.  Salen emailed an example of an Irrevocable Letter of Credit that contained an expiration date to EZN's counsel on June 5, 2008 for their review. APP000131-134, 801 (Weingast Dep.) lines 8-13.  A week later, Salen forwarded terms for release of the Letter of Credit (hereafter "LOC") to Hirsh for review. APP000137-139, 140.  On June 12, 2008, Hirsh wrote the terms for release were acceptable but wanted to see the LOC with the actual terms of release when it was

8

received. APP000141.   Thereafter, on June 30, 2008, a notification was sent to

EZN's Managing Director advising of the terms of the LOC issued on Best's

behalf by Wachovia Bank.   APP000148-150. 794 (Weingast Dep.) lines 6-13.

Wachovia subsequently emailed a copy of the Letter of Credit to Weingast on July

1, 2008. APP000151.

### C. Although Best Took the Necessary Steps to Carry Out the D & D, Defendant's Failure to Cooperate Prevented Best from Completing the D & D.

Best met with Rainer Pruesse (hereafter "Pruesse") of Gamma Services in

January 2008, four months *prior* to entering into the SA, to discuss removing the

production line and shipping it to the U.S. or Europe.   APP00089, 1059 (Fritz

Dep.) lines 17-21 and 1060 lines 7-21.   Less than two weeks after the parties

entered into the SA, Best was already making plans to move the production line

and get it working again. APP000119.  EZN was only looking at ways they could

make money on the D & D. APP000119.   After the parties entered into the SA,

Best continued communicating with Pruesse to coordinate the D & D process.

APP000126, 152, 155, 174, 185, 187-188, 203, 213, 240-241.

Best could not begin the D & D of the production line until EZN provided

the Source Trains required by the Settlement Agreement as the production line was

needed to manufacture the Source Trains. APP000167.  On June 26, 2008, Hirsh

emailed Weingast confirming Best's order and stating the order was in the final

9

stages of quality control. APP000143. However, once the quality control tests were completed, EZN notified Best on June 27, 2008 that the sources had "suffered radioactive decay" and that the sources were "up to 10% below the normal output specification" for new Source Trains **and requested that Best acknowledge this fact before they shipped the Source Trains to Best.** APP000144. This notice was provided pursuant to ¶10.2 of the SMA which provides that if either party discovers that a batch of Source Trains does not meet, "the discovering party shall promptly communicate in writing with the other party to determine a mutually agreed course of action." APP000475-476. Although Evans advised Craig Reed (hereafter "Reed"), a former Director of Radiation Science with Novoste, that EZN did not know the sources were "dead cold," the evidence shows that EZN knew or at least suspected that the Source Trains were not within specification prior to conducting the quality control tests. APP000122, 165, 169-170, 682 (Reed Dep.) lines 9-21. EZN's failure to provide in specification Source Trains was a breach of the SA. APP000686, line 16-22, - 687, lines 1-7.

In order to comply with the Food and Drug Administration's Premarket Approval (PMA) for the medical device that incorporated the JRST's, the sources in each train had to equal or exceed 2.765mCi at the time of distribution in order to remain within the PMA limit during the entire one-year use period. APP000158, APP000687 (Reed Dep.), lines 9-22, - 688, lines 1-2, and 689 (Reed Dep.) lines

10

10-16.   By back-calculating the amount of the decay, it was apparent that the sources were never within specification.  APP000145, 158-159, APP000696-697 (Reed Dep.) lines 7-22, 1-16.

EZN took the position that they only had to provide what they had, regardless of whether the sources were within specification when produced. APP000146, 981-982 (Menuhr Dep.) lines 16-22, 1-14.  Best could not use out-of-specification Source Trains.  APP000698-699 (Reed Dep.) lines 15-22, 1-21.  The SA, however, provides "sources and Source Trains shall refer to radioactive sources and Source Trains manufactured by QSA under the SMA." APP000446, ¶2, APP000692-693 (Reed Dep.) lines 14-22, 1-9.  The SMA did not require Best to accept out of specification Sources or Source Trains.  APP000475-476, ¶10.2. To the contrary, the SMA provides that EZN was required to replace the out-of-specification,  reimburse Best for its actual costs incurred to return out-of-specification Source Trains, and indemnify Best for any other costs incurred as a result of receiving out-of-specification Source Trains.  APP000475-476, ¶10.2. Accordingly, Best declined to provide EZN with permission to ship the out-of-specification Source Trains. APP000160, 146, 475-476, ¶10.2(i)-(iii).

Unknown to Best at the time, EZN was already creating obstacles behind the scenes to prevent Best from completing the D & D process.  On July 3, 2008, Fritz Hohn (hereafter "Hohn"), the Managing Director of the Braunschweig facility,

11

ordered that Pruesse not be left alone when at their facility and that he be allowed only to enter the conference room.  APP000153, 1236 (Hohn Dep.) lines 15-24.

On July 8, 2008, Pruesse forwarded two non-binding quotes to Weingast for the decommissioning of the production line.  APP000155-156.  On September 22, 2008, Menuhr advised Evans that there might still be some in specification 40mm trains and explained that the seeds were not individualized at measurement and they would have to get the whole system working again to re-measure them. APP000167.  Thereafter, on September 29, 2008, Howard advised Salen that EZN was prepared to test 30mm JRST's but was holding off until Salen advised whether Best was interested in 30mm JRST's.  APP000171.  Salen responded that she would speak to Weingast regarding whether Best would accept in specification 30mm Source Trains.  APP000171.

After further negotiation between Best and Pruesse, on October 17, 2008, Pruesse provided Best with a revised quote for Gamma's work on the D & D and stated his best quote was €288,500 plus VAT, GE's & EZN's costs.  APP000175, 173.  However, since EZN's relationship with Pruesse was "tense" and Pruesse's employer, Gamma Services, was a competitor to EZN in some areas, Best asked EZN to provide an estimate for completion of the D & D, which they did on January 19, 2009.  APP000182-183; APP0001229 (Hohn Dep.), lines 21-25, APP0001230, lines 1-25.  EZN estimated the cost of the D & D, including

supplying containers for the disposal of the resulting waste, was €386,000.00. APP000182-183. On February 11, 2009, Salen advised Hirsh that Best had obtained a lower price as it did not intend to dispose of the materials in Germany. APP000184. EZN's counsel advised on March 11, 2009 that Best's personnel would need to coordinate the D & D work with Hohn. APP000186.

On March 13, 2009, a teleconference was held with G.E. regarding risk assessments. APP000188. G.E. had overall responsibility for the site. APP0001237-1238 (Hohn Dep.) lines 12-25, 1-6. It was also determined that a meeting needed to be scheduled between March 25 and March 27 to discuss the details. APP000188. On March 16, 2009, one month before the deadline for completion of the D & D, Guenter Schwarzl (hereafter "Schwarzl") from G.E. emailed Pruesse setting forth the requirements for removing the production line including the need for a detailed plan to be submitted to G.E. and for a contract between Best and EZN. APP000190, 90-117. No D & D work could commence without first obtaining G.E.'s approval and complying with their requirements. APP000199, 190, 188, 205, 242, 152, 1249-1250 (Hohn Dep.) lines 20-25, 1-17. Accordingly, on March 17, 2009, Salen wrote to Hohn advising Best may not be able to complete the D & D obligation by April 16, 2009 but advising that Reed would contact them to make arrangements to commence the D & D. APP000192. On March 26, 2009 EZN's counsel demanded payment of €50,000 for "the 30 day

13

grace period" provided by the SA.  APP000196-198.    Howard again wrote to
Salen on April 24 and May 19, 2009 threatening litigation if Best did not make
progress on the D & D and forwarded two additional invoices for €50,000 each to
extend the deadline for the D & D to July 16, 2009. APP000201, 206-208.

On June 12, 2009, Best obtained the services of Eberhard Fritz (hereafter
"Fritz") to coordinate the highly technical D & D process.  APP000216-220. Fritz
designed the production line. APP0001059 (Fritz Dep.) lines 3-7.    Best also
dispatched Dr. Jag Uppal (hereafter "Uppal"), an advisor to Best who was fluent in
German, to meet with Fritz and  Hohn at EZN's facility on June 24, 2009 to
discuss their disagreement about the terms for payments pursuant to the SA.
APP000221, 232, 236-238.   Hohn emailed Krish on June 18, 2009 stating he
thought that "there should be a way forward that at the end will be a win-win
situation for both us…." APP000231. This meeting was held to "maybe still hold
the door open for BMI to achieve its ultimate goal to dismantle and ship the
production units to Atlanta, Georgia." APP000236.  The minutes of this meeting
indicate that Hohn acknowledged that Best owned the production line, further
asserted that EZN was entitled to €50,000 extension fee per month, that EZN had
already started the D & D, that they stopped the D & D, and would work with Best
if Best paid €150,000 by July 3, 2009.  APP000234, 236.

A second meeting was held on June 30, 2009 with Hohn, Menuhr, Fritz, Uppal, Pruesse and a colleague of Pruesse's from Gamma Services. APP000242-244.    Hohn stated at this meeting that four people would be assigned by EZN to work on the D & D, but they would work with Gamma Services and expected the D & D to take approximately 10 weeks. APP000242.    Hohn also asserted that EZN must be paid €50,000 per month for the time required to dismantle the production line. APP000242.  Hohn acknowledged that EZN was depending "to a large extent on G.E. (our landlord) who has to provide in parallel to the dismantling project all the necessary means of radiation protection." APP000242. As of June 30, 2009, the parties appeared to be in agreement that EZN would retain a leadership role and that Best would pay the shipping costs separate from paying for the costs of the D & D to EZN and Gamma Services. APP000242-244.

On July 2, 2009, Krishnan Suthanthiran (hereafter "Krish") the owner and President of BMI and BVI, wrote to Hohn stating that Best wanted to continue cooperating with EZN. APP000249-250.    However, Hohn wrote back that same day stating that it was "too late" because "the settlement agreement expired" and insisted that €150,000 for the three month extension be paid by July 3rd and that an additional €200,000 be paid by July 17th as down payment for the D & D. APP000249.    A few days later, on July 6, 2009, Hohn  expressed "a willingness and interest on our part to collaborate with you and your people" and stated that

15

once Best paid the extension fees he could get started with planning the next steps. APP000252.

Every time Best came close to commencing the D & D, EZN created an obstacle that prevented Best from proceeding. On July 8, 2009, Fritz visited the site and had a two-hour meeting with Menuhr but did not inspect the production line because there was no separate Confidentiality Agreement between Fritz and EZN, and all the people he wanted to interview were not available. APP000263, 258, 1118-1120 (Fritz Dep.) lines 11-22, 1-22, 1-6. On July 10, 2009, despite allowing Fritz to conduct a physical inspection of the production line components, EZN for the first time stated that they would not let him begin the D & D without written consent from Best. APP000268.

Following his inspection, Fritz prepared a Status Report dated July 10, 2009 that set forth his initial thoughts on how to reduce cost and the length of time to complete the D & D while protecting the plant so it could be rebuilt in Georgia. APP000270-274. The Status Report indicates that EZN was working with G.E.'s radiation safety group to map dose rate and in-box contamination as there were no current measurements. APP000271. Pursuant to ¶3(c) of the SA, this was the responsibility of EZN. APP000447.

On July 15, 2009, however, Fritz advised Best that Menuhr refused to meet with him and he believed that EZN would begin the decommissioning next week if

16

they were not paid the disputed €200,000 extension fees. APP000281. In an attempt to show good faith, Best forwarded €150,000 to EZN on July 16, 2009. APP000282, 865 (Weingast Dep.) lines 11-14. On July 17, 2009, Hohn emailed Krish advising that the €150,000 arrived yesterday and that we could now "move forward." APP000282. Hohn also stated that over the past two weeks there had been discussions on how to tackle the project and that EZN had started to decontaminate Reed and payment of €200,000 to start the D & D. APP000282.

On July 22, 2009, Krish emailed Hohn advising another €50,000 was being wired and stating that we hired Fritz to coordinate removal and shipment of the line to us and that EZN was causing the delay by refusing to allow Fritz and Rohit Mehta, BMI's Director of Operations, to return to the facility after July 15, 2009. APP000289, 743 (Reed Dep.) lines 5-15. Nevertheless, Reed emailed Hohn a summary proposal for plant de-activation for review and comment on July 24, 2009 and discussed shipping requirements and containers. APP000290, 516. On July 27, 2009, Hohn emailed Krish advising they were in agreement with Reed's D & D proposal with Fritz having full authorization over the work, and that EZN would now provide an official offer not to exceed €400,000 with €200,000 of that amount to be due on August 7, 2009 as an up-front payment on the D & D work. APP000291. Subsequently, on August 5, 2009 Hohn agreed to accept €100,000 up

front to start the D & D process and then pay an additional €100,000 when EZN had spent the first payment. APP000293.

On August 12, 2009, Hohn responded to Best's concerns with the decommissioning process stating that EZN approved the use of shipping containers rather than disposal containers and that the most expensive and longest part is going to be G.E. safety clearance. APP000293. Fritz advised Weingast on August 15, 2009 that he was busy and would need assistance from Reed and Rohit Mehta as well as his partner, Rainer, as his permanent assistant. APP000295, 298. Weingast advised Hohn on August 23, 2009 that the decommissioning plan was being drafted. APP000296. In order to resolve their differences, Krish offered to travel to Braunschweig to discuss the matter. APP000297, 299. Krish met with Hohn in Germany on September 4, 2009 to discuss the issues that remained in dispute. APP000301-302. Hohn confirmed at this meeting that EZN urgently needed the space and was willing and interested in working with Best to ship the equipment to Georgia, and that the work needed to be coordinated with G.E. APP000301, 1115-1116 (Fritz Dep.) lines 21-22, 1-16.

Following the meeting, Krish put his understanding of their **agreements** in writing confirming (1) that BVI has the license from Georgia for receiving the production line; (2) Reed and Fritz will forward a proposal for review and approval by September 11, 2009; (3) EZN will waive the "storage fee" upon beginning the

18

process of removing the production line and no storage fee will be charged from mid-August to present; (4) Best will be billed for their services at cost & BVI will pay within 30 days; (5) Krish agreed to release the €200,000 performance bond provided by EZN and requested that their bond guarantee also be released "since we are making progress on the removal of the production line from your facility"; and (6) BVI will provide containers for shipping the production line to Georgia. APP000303-304.    Reed forwarded a draft plan for the D & D to Fritz on September 6, 2009.  APP000306.

On September 15, 2009, Reed forwarded Fritz's detailed project plan that incorporated the information required by G.E. to Hohn and Menuhr.  APP000318. Hohn replied on September 16, 2009 that he would review the plan and provide an answer in a few days.  APP000318.  Menuhr emailed Schwarzl on September 22, 2009 requesting a meeting to discuss in detail the removal of the production line. APP000324.    The next day Menuhr emailed Reed advising that a final meeting was scheduled with G.E. and that initial reactions were positive. APP000325.  On that same day, Fritz advised Reed that Hohn was now refusing to allow Rainer Pintaske, Pruesse's colleague at Gamma Services, as a second consultant for the project working under Fritz's guidance.  APP000326.

Hohn emailed Krish on September 25, 2009 in response to Krish's September 4, 2009 email discussing his understanding of the parties' agreements

19

from the September 4th meeting and acknowledging that we can get started with the D & D "once we have the feedback" from G.E. APP000327. Hohn disputed that EZN would do the work at cost but stated they would invoice Best for costs plus a 5% profit. APP000327, 1275 (Hohn Dep.) lines 1-25. However, at deposition, Hohn admitted that he had offered to do the work at cost but later changed his mind. APP0001275 (Hohn Dep.) lines 14-25. A meeting was held with G.E. on September 29, 2009 to discuss the project plan. They did not get through the whole plan, so a second meeting had to be scheduled. APP000330. Best was still awaiting G.E. approval on October 2, 2009. APP000332. It was also noted that G.E. needed Reed to provide a more detailed survey strategy. APP000333-334.

The issue regarding the sources and Source Trains EZN was to provide under the SA was raised again on October 7, 2009 when Reed advised Weingast that Menuhr needed an answer regarding the 500 sources due to Best that were never within specification and that this issue needed to be resolved before the QA box could be dismantled. APP000337. Reed inquired as to whether there were any 30mm Source Trains that were in spec on October 13, 2009. APP000338. The following day Menuhr asked Hohn how to respond given that they would have to fire up the equipment again to finish production which would delay the D & D by another several weeks. APP000339. Hohn responded that the "settlement agreement has long ago ceased" and that he would not agree to delay the D & D.

20

APP000339.    Accordingly, Menuhr advised Reed on October 15, 2009 that the 30mm trains were no longer available as they had been disposed of "because the settlement agreement had expired concerning this point." APP000340.  These are the same sources Best paid EZN €100,000 for pursuant to the terms of the Settlement Agreement.  APP000446.  Best never received any in specification sources or Source Trains from EZN nor any refund although both were requested. APP000172, 160, 164, 822, line10, to 825, line 18 (Weingast Dep.) .

In response to G.E.'s request for a detailed survey strategy, on October 15, 2009, Reed forwarded his draft Radiological Characterization Plan and spreadsheet which specified the minimum number of surveys that must be documented and analyzed to Menuhr.  APP000341.  On October 22, 2009, Hohn emailed Krish stating that G.E. had accepted the plan with a few changes and the details had been worked out.  APP000342.  G.E.'s changes to the plan rendered a lot of Best's planning worthless.  APP0001128-1130 (Fritz Dep.) lines 1-22, 1-22, 1-18.  Hohn also advised that EZN would assign five experts to this task full time at eight hours per day with Fritz assigning and controlling the work. APP000342.

On November 9, 2009, Fritz advised Hohn that he was not available and that Reed would act as Project Manager for the D & D work.  APP000346.  Hohn responded that he "cannot wait any longer to clear the space." APP000346.  Hohn also emailed Menuhr stating he was not sure he wanted Craig Reed there as Project

21

Manager. APP000347. Menuhr responded that he agreed, which was why he and Mr. Fasten (from G.E.) were **"currently working on making it more difficult,"** and stating it will be difficult for Craig to get a permit to work on the premises. APP000347. Hohn responded that Fritz may be helpful but not Reed, and that if they refused entry to Reed, Andreas (Eckert, EZN's CEO) would find that very good. APP000347. The SA does not allow EZN to deny Best access to the production line. APP000447, ¶3(c). To further their goal of impeding Best from completing the D & D and knowing that Best wanted to keep its costs under control, EZN prepared a proposal for Best dated November 12, 2009, which required Fritz to be the full-time project manager, with authorization to make local decisions (may consult with Reed), and which provided that EZN would assign five workers for the entire 12 week project at a rate of **€276 per hour per production worker**. APP000350-351, 343. The proposal also set forth EZN's and G.E.'s responsibilities and stated Best would need a contract pursuant to German law with the project manager to enable him to work on their premises. APP000351. Prior to the issuance of this proposal by EZN, the parties had agreed on all the details, G.E. had allegedly approved the plan, and Best was on the verge of beginning the D & D work. APP000301-302, 342.

The rate quoted by EZN was believed to be the rate for all five workers combined, not individually, since the hourly rate per individual would substantially

exceed the amount previously quoted by EZN to perform the D & D, so clarification of the rate was requested. APP000354. Menuhr responded that the rate was per person, per hour. APP000354. Best was shocked to learn that EZN intended to charge €276 per hour, per worker. APP000357. Over the expected 12 week period, the cost for these five workers alone would total at least €616,000. APP000357. On November 13, 2009, Reed forwarded the new quotation to Fritz. APP000354. Fritz was also surprised at the rate being charged by EZN. APP000360. Fritz responded that he was not available full-time now due to other commitments and stated that EZN was being "quite tricky" in requiring him to be there full-time. APP000355, 348. Fritz further stated that he believed EZN wanted to do the work themselves and dispose of the production line, and that he did not understand why it had become so complicated. APP000355. Even EZN's own attorneys agreed with Best that the D & D was not intended to be a moneymaker for EZN. APP000366. Before the parties could reach an agreement on this matter, Hohn left EZN in December 2009. APP000367. As a result, Fritz advised Reed on December 21, 2009, that he did not know how to proceed but would contact Menuhr. APP000367. Fritz also noted that the high labor rate makes it impossible to compromise. APP000367.

EZN did not advise Fritz or Best of the name of the person who would be taking over Hohn's responsibilities and did not notify Best that Hohn had left EZN

until January 13, 2010. APP000587.  On January 13, 2010 Frank Yeager emailed Krish advising that he had instructed his attorneys to work with Best's attorneys "to execute the previous agreement." APP000587.  Rather than working together to execute the previous agreement, on January 13, 2010, Christine Pollard, (hereafter Pollard) another attorney for EZN, advised that they were proceeding with the D & D and intended to draw on the LOC and requested the original be forwarded. APP000589-590.  Additionally, Pollard advised that EZN intended to dispose of the production line but if Best wanted the line, Best must specify which equipment it wanted, and once Best was notified that the equipment was available for shipment, Best would have 10 days to arrange for removal and if not removed within that time, the equipment would be destroyed. APP000590.

Salen responded to Pollard on February 5, 2010 stating that the current management of EZN appears to be "purposefully and intentionally unaware of the status of the decommissioning process" and advising that she would forward four separate emails with the plans for the D & D; the letter further stated that Best was prepared to do the D & D and still wanted Fritz to supervise the work, and if EZN truly wanted to move the process forward, they need only engage in a productive dialogue with Best about how to move forward efficiently and with the least amount of cost.  APP000382.  EZN rejected this offer on March 10, 2010 stating that EZN intended to proceed with the D & D.  APP000383-384.  Pollard further

24

reiterated that if Best wanted the production line, it would need to be packed in containers provided by Best, but if the containers were not there when needed, the production line would be disposed of by EZN. APP000383-384. Additionally, Best had to have a license to transport the line before Best took possession. APP000384. Pollard also stated that Best was in default but agreed to perform the D & D for €200,000 plus release of EZN's performance bond. APP000384.

On March 24, 2010, EZN's counsel imposed another condition on releasing the production line to Best – if the production line was to be released to Best, EZN required Best to release them of all liability and enclosed a proposed release. APP000385-386. Thereafter, Best attempted to obtain the containers but EZN again refused to provided needed information to Best's vendor, GTS. APP000627, 766-767 (Reed Dep.) lines 9-22, 1-20. Salen wrote to Pollard on March 31, 2010 asking who Reed could contact regarding this matter and also requesting that Best be permitted to oversee the packing of the containers to ensure that the line is dismantled and packed so that it can be reassembled. APP000627-628.

Pollard responded on April 9, 2010, just seven days before Best was expected to have the containers at EZN's facility, and advised that Reed could contact Menuhr regarding the dismantling schedule, and Cary Renquist, an employee of EZN, regarding the documentation needed to take custody of the production line. APP000391-392. Pollard further asked if Best would sign the

25

Release and reiterated that this issue must be resolved before Best took possession of the production line.  APP000391-392.

Although Best tried to obtain the necessary containers by the April 16, 2010 deadline set by EZN, due to complications outside of Best's control, the containers were not able to be obtained by the deadline.  APP000394, 398.   On April 19, 2010, Pollard advised Salen that because Best had not provided the original LOC, had not signed the proposed Release, had not provided documentation authorizing Best to ship the production line, and since the four shipping containers were not delivered on April 16, 2010, EZN had begun decommissioning the line and would permanently dispose of the entire line so there was no need to deliver containers since no containers would be packed.  APP000409-410.  At this point, EZN would no longer talk to anyone from Best.  APP000408.  On May 3, 2010 Pollard stated for the first time that Best no longer had any rights to the production line it owned. APP000420.   The cost of rebuilding the production line in October 2010 was $3,716,710.00.  APP000629-631.

## V.    SUMMARY OF THE ARGUMENT

### A.    EQUITABLE ESTOPPEL SUMMARY

Under Virginia law, the doctrine of equitable estoppel is not limited to particular factual situations or hard and fast rules but is used to provide a remedy to one who, in reliance of representations by another, changes his position to his

detriment. Fraud and deceit are not required for equitable estopped to apply. While equitable estoppel is frequently used as an affirmative defense, it is not limited to this use. The case law cited below demonstrates that it does not matter whether the party seeking equitable estoppel is a plaintiff or a defendant but whether the elements of equitable estoppel have been established. Equitable estoppel has been asserted in Virginia in connection with breach of contract claims by a plaintiff. The primary issue is whether the reliance was reasonable which is a factual issue for the trier of fact because reasonableness goes to the state of mind of the person seeking equitable estoppel.

In this case, EZN represented both verbally and in writing that Best could conduct the D & D although the deadline and extension periods had elapsed by scheduling meetings and reiterating these agreements in the minutes to the meetings. Specifically, the minutes to the September 4, 2009 meeting required Best to create a time schedule and plan for removal of the production line. APP000301-302, 303. Moreover, EZN was obligated under ¶3(c) of the SA to coordinate with G.E. relative to obtaining the necessary approval. APP000447. G.E.'s approval was not obtained, according to EZN, until October 22, 2009. APP000342. Once that obstacle was removed, EZN began taking actions to prevent Best from commencing the D & D such as requiring that Fritz be at the facility full-time to supervise the D & D although they knew he was not available

27

full-time, refusing to allow Pintaske or Reed to supervise the D & D during the time Fritz was not available, withdrawing their previous reasonable offers to complete the D & D, and submitting an unreasonable offer that would make the cost of saving the production line so high that Best would be unable or unwilling to save the technology. APP000339, 347, 326, 350-351, 1136-1137 (Fritz Dep.) lines 4-22, 1-22.

Best reasonably relied on these representations because (1) EZN was required to cooperate with Best pursuant to the terms of the SA (APP000447, ¶3(c)); (2) EZN's management repeatedly stated to Best's representatives and employees that they would work with Best while taking actions behind the scenes of which Best was unaware. APP000252, 301-302, 305, 326, 327, 339, 350-351. Accordingly, in 2009, Best retained Fritz to act as a technical expert in the removal and packaging of the production line and sent Fritz and other employees to Germany to meet with EZN to work out the details of removal. APP000216-220, 230, 236, 242, 289. Best also prepared detailed plans for the dismantling of the production line as well as a radiological survey. APP000271, 529-546, 548-577. Best paid €200,000 in extension fees although G.E. approval had not been obtained by EZN, and the D & D could not commence without such approval. APP000282, 650, 199, 190, 188, 205, 242, 152. Best was harmed by EZN's representations not only for the loss of significant sums of money for the extension periods and source

28

inventory, but more importantly the destruction of Best's valuable production line. APP000282, 650, 632.

## B.    SUMMARY OF CONTRACT CLAIMS

The crux of this case turns on interpretation of the SA.  The SA provided that EZN was required to cooperate with Best relative to the D & D obligation. APP000447, ¶3(c).    However, EZN and Best are competitors so EZN was motivated from the start to prevent Best from completing the D & D and saving the production line. APP0001283, lines17-23.  To that end, EZN repeatedly set up roadblocks to prevent Best from accomplishing the D & D and shipping it to Best's facility in Norcross, Georgia, such as initially denying Pruesse access to the production line (APP000153), and later by refusing to allow Fritz's colleague, Pintaske, to supervise the D & D (APP000326), refusing to allow Reed to supervise the D & D (APP000347), requiring Fritz to be present full-time at the facility during the D & D even though EZN knew that Fritz had other commitments that prevented him from doing so (APP000339), and finally by revoking their prior reasonable offer for completion of the D & D and replacing it with an offer that made it prohibitively expensive for Best to save the technology. APP000350-351.

Best did not have the obligation or the ability to coordinate the D & D with EZN's landlord, G.E., and was never given permission to contact G.E. directly.

EZN representatives stated on numerous occasions that approval had to be obtained from G.E. prior to commencement of the D & D. APP000190, 301, 157, 199, 203, 205, 242. The facts show that G.E.'s approval was not allegedly obtained until October 22, 2009[1], well after the deadline and extension periods set forth in the SA. APP000342. Therefore, Best could not have been in default because G.E. approval was required *before* Best could perform the D & D. It may have taken EZN longer to obtain G.E.'s approval than EZN anticipated or EZN may have deliberately delayed the process of obtaining G.E.'s approval in order to force Best into "default," but either way, Best could not commence the D & D until G.E's approval was obtained.

Another obligation that EZN was required to fulfill under the SA was providing 500 sources in Source Trains. APP000446, ¶2. The SA provided that EZN only had to attempt to satisfy Best's preference for the length of the Source Train. APP000446, ¶2. However, the SA clearly provided that sources and Source Trains referred to radioactive sources and Source Trains manufactured under the SMA. APP000446, ¶2. The SMA, however, does not require Best to accept out of specification Source Trains. APP000475-476, ¶10.2. Moreover, the SA provides

---

[1] Appellant does not have any evidence that G.E.'s approval was ever obtained. Defendant never produced any documentation showing that G.E. approved the Radiological Characterization Plan or any other plan submitted by Best in connection with the D & D. See APP000752 -753(Reed Dep.) lines 15-22, 1-22; APP000758-759 (Reed Dep.), lines 7-22, 1-10; APP000765 lines 11-20. Menuhr testified G.E. verbally approved the plan. APP0001030, lines 3-13.

that EZN is required to accept sources and Source Trains for disposal. APP000450, ¶4(b). It would be illogical for Best to be required to accept out-of-specification sources and/or Source Trains from EZN which Best could then return to EZN for disposal under ¶4 of the SA. If the sources and sources were out of specification, then they did not constitute usable inventory that Best had already paid for and was obligated to purchase. It was EZN's obligation under the SA to dispose of out-of-specification or out-of-date sources and Source Trains. APP000450, ¶4(b).

Finally, EZN did not have the statutory or contractual right to destroy the production line. The SA provided that if Best did not complete the D & D, then EZN had the right to "complete the D & D obligation using commercially reasonable efforts." APP000448, ¶3(e)(iii). The SA does not give EZN the right to destroy the production line but only to decontaminate and decommission the production line using commercially reasonable efforts. APP000447, ¶3(e)(iii). EZN did not and cannot cite any provision of the SA or any statute that permitted them to destroy the production line. EZN could have completed the D & D without destroying the production line but chose not to do so because they wanted to prevent Best from preserving the production line and potentially using it to manufacture competing products.

31

## VI.   ARGUMENT

### A.    Standard of Review

Review of a grant of summary judgment is *de novo*. *Higgins v. E.I. Du Pont de Nemours & Co.,* 863 F.2d 1162, 1167 (4th Cir. 1988). Federal appellate courts apply the same legal test as the district court. *Elliott v. Sara Lee Corp.,* 190 F.3d 601, 605 (4th Cir. 1999).  Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c).* In the Fourth Circuit, an appeal taken from the district court's grant of summary judgment is reviewed in the light most favorable to the non-moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (noting that all evidence must be construed in the light most favorable to the party opposing summary judgment).

### B.    DID THE DISTRICT COURT ERR IN GRANTING EZN'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' EQUITABLE ESTOPPEL CLAIM?

Contrary to EZN's counsel's argument at the April 11, 2011 hearing, equitable estoppel is a valid claim under Virginia law.  APP0001319, lines 21-22. The doctrine of equitable estoppel is a "well-established concept invoked by the

32

courts to aid a party who, in good faith, has relied, to his detriment upon the representations of another." *Datastaff Technology Group, Inc. v. Centex Construction Co., Inc.,* 528 F. Supp.2d 587, 593 (E.D. Va. 2007) *citing United States ex rel. Humble Oil & Ref. Co. v. Fid. & Cas. Co. of New York,* 402 F.2d 893, 897 (4th Cir. 1968). Equitable estoppel is a venerable doctrine that "is not limited to a particular factual situation nor subject to resolution by simple or hard and fast rules." *Rambus, Inc. v. Infineon Technologies AG,* 326 F. Supp. 2d 721, 737 (E.D. Va. 2004) (internal citations omitted). The doctrine of equitable estoppel exists to prevent a wrong from being perpetrated. *Meriweather Mowing Service, Inc. v. St. Anne's-Belfield, Inc.,* 51 Va. Cir. 517, 519 (Charlottesville 2000).

Estoppel occurs where the aggrieved party reasonably relied on the words and conduct of the person to be estopped. *Gitter v. Cardiac & Thoracic Surgical Assocs. Ltd.,* 419 Fed. Appx. 365, 369 (4th Cir. 2011) *citing Barry v. Donnelly,* 781 F.2d 1040, 1042 (4th Cir. 1986)(internal citations omitted). Estoppel, as a doctrine in equity, is the consequence worked by operation of law which enjoins one whose action or inaction has induced reliance by another from benefiting from a change in his position at the expense of the other. *Employers Commercial Union Ins. Co. of America v. Great America Ins. Co.,* 214 Va. 410, 200 S.E.2d 560, 562 (Va. 1973). Under Virginia law, absent a showing of fraud and deception, a party asserting

equitable estoppel must establish representation, reliance, a change of position and detriment. *T. v. T.*, 216 Va. 867, 224 S.E.2d 148, 152 (1976) [2]; *see also, Tidewater Beverage Services, Inc. v. Coca Cola Co., Inc.,* 907 F. Supp 943, 946 (E.D. Va. 1995). The modern rule of equitable estoppel, adopted in Virginia in the case of *T. v. T.*, has been expressed as follows:

> It is not necessary that the representations and conduct should be labeled as fraudulent in a strict legal sense or that they were made or carried out with an intention to mislead the plaintiff . . . . A person is estopped from denying the consequences of his conduct where that conduct has been such to induce another to change his position in good faith or such that a reasonable man would rely upon the representations made.

*Paul Bruce, Inc. v. Gemini Asset Managers,* 35 Va. Cir. 372, 379 *citing United States ex rel. Humble Oil & Ref. Co. v. Fidelity & Casualty Co.,* 402 F.2d 893 (4th Cir. 1968).

Defendant would have the Court believe that equitable estoppel can only be raised by a defendant as a defense and that the "Virginia Supreme Court never recognizes an affirmative claim." APP0001319, lines 21-22. Case law does not support Defendant's position. In order for there to be an estoppel by conduct, the party sought to be estopped must have caused the other party to occupy a more disadvantageous position than that which he would have occupied except for that

---

[2] The SA, ¶12, provides that the SA "shall be construed, interpreted, and administered in accordance with the law of the Commonwealth of Virginia." Therefore, Virginia law applies to this case. APP000453.

conduct. *Atlantic Coast Line Railroad Co. v. Bryan,* 109 Va. 523, 526, 65 S.E. 30, 31 (1909). For example, in *Barry v. Donnelly,* the district court granted summary judgment in favor of Barry, the defendant. The Donnellys' appealed the district court's order barring them from suing to recover a valuable painting due to expiration of the statute of limitations. The Fourth Circuit reversed holding that there were genuine issues of material fact that rendered summary judgment inappropriate. The Court reiterated that under Virginia law, one may be estopped to plead the bar of a statute of limitations by conduct short of fraud, under the general doctrine of equitable estoppel. *Id., citing City of Bedford v. James Leffel & Co.,* 558 F.2d 216, 217-18 (4th Cir. 1977).

In *Gitter v. Cardiac & Thoracic Surgical Associates, Ltd,* plaintiff sued defendants alleging breach of contract and equitable estoppel. The District Court granted summary judgment in favor of Defendants but the Fourth Circuit vacated the order and remanded the case for further proceedings as to whether the plaintiff doctor's reliance on defendant's assurances was reasonable. *Gitter v. Cardiac & Thoracic Surgical Associates, Ltd.,* 419 Fed. Appx. 365, 371 (4th Cir. 2011). The Court in *Gitter* relied on Virginia Supreme Court precedent in reaching their decision. *Id.* at 369. It is equally evident that a claim for equitable estoppel can be maintained in a breach of contract suit. *Id.* at 366. The result should be the same in the case at bar because it is procedurally identical to *Gitter* in that Plaintiffs also

35

sued for equitable estoppel and breach of contract based on EZN's actions and conduct in leading Best to believe that if they paid €200,000, they would be permitted to control the D & D even though the deadline and extension periods had elapsed. Reliance and reasonableness are preeminently factual issues for the trier of fact because they go to the subjective state of mind of the person asserting equitable estoppel. *Gitter,* 419 Fed. Appx. at 370 (internal citations omitted). Thus, the bar for deciding the reasonableness of a party's reliance at the summary judgment stage is high. *Id., citing Bank of Montreal v. Signet Bank,* 193 F.3d 818, 834 (4th Cir. 1999)(citations omitted).

Equitable estoppel has been applied to many different types of factual situations, in addition to statute of limitations, including, but not limited to, the statute of frauds (*See, e.g., Tidewater Beverage Services, Inc. v. Coca-Cola Co., Inc.,supra*), patent and intellectual property rights (*See, e.g., Rambus, Inc. v. Infineon Technologies AG, supra)* and contract actions under the Miller Act (*See, e.g., United States of America v. United States Fidelity & Guaranty Co.,* 133 Fed. Appx. 58 (4th Cir. 2005). The Virginia Supreme Court has never held that a plaintiff cannot seek the protection of equitable estoppel to prevent from being harmed by a defendant. If this was the case, a defendant inflicting harm on another would never be subject to a lawsuit by the injured party and such parties would potentially be left with no remedy. In this case, damages for breach of contract will

not provide Best with possession of the property it owns and is to which it is entitled. Nor should EZN be permitted to destroy valuable property that belongs to Best and escape justice entirely simply because Best's name appears first in the caption of the lawsuit. Virginia Circuit Courts have held that "equitable estoppel usually operates as a shield, as opposed to a sword, ... it serves to prevent losses otherwise inescapable and to preserve rights already acquired." *Meriweather Mowing Service, Inc. v. St. Anne's-Belfield, Inc.,* 517 Va. Cir. 517,519 (Charlottesville 2000) *citing* . In this case, Best plead equitable estoppel as a shield to protect itself from harm arising from the destruction of its valuable production line.

### 1.    EZN's Representations and Actions

In this case, EZN, through their employees and agents, represented verbally and in writing that Best could still conduct the D & D although the deadline for completion of the D & D had elapsed provided Best paid the extension fees. APP000236, 239, 243. Specifically, in the minutes to the June 30, 2009 meeting EZN agreed that Best's contractor, Gamma Services "could dismantle the units, pack them into containers and make them ready for overseas shipment...." APP000243. Additionally, the first physical inspection of the plant by Fritz on behalf of Best did not occur until July 10, 2009. APP000271. The only condition imposed by EZN was the payment of €50,000 per month extension fee provided

for in the SA. APP000282. Once Best paid EZN €200,000 for the four month extension in July 2009, Hohn indicated that Best and EZN could move forward and that discussions had occurred regarding how to tackle the project. APP000282. Best also obtained a license to possess the equipment. APP000292, 725 (Reed Dep.) lines 17-21. On September 4, 2009, Krish met with Hohn, Menuhr, Reed, and Fritz in Germany. APP000301-302. According to the minutes prepared by EZN, Krish confirmed that Best was "very much interested in transferring the equipment to Georgia and in preserving the technology...." APP000301. Hohn further stated that EZN was "willing and interested in working together with Best...." APP000301, 291. It was further agreed that Best would work out a time schedule and plan for removal of the production line. APP000301. These acts show that EZN was still permitting Best to control the D & D although the original deadline and the extensions provided by the SA had elapsed. Additionally, at a senior management meeting held at EZN on September 15, 2009, Hohn indicated that Krish's approval for disassembly and discussion with G.E. were pending. APP000317. Hohn's September 25, 2009 email further evidences that the work could not have begun prior to that time because G.E. had not approved the project and all work on the project had to be coordinated with G.E. APP000301, 327. G.E.'s approval was a condition precedent[3] to the commencement of the D & D,

---

[3] A condition precedent is defined as "[a]n act or event, other than a lapse of time,

therefore Best could not have been in default for not completing the D & D during the time period set out in the SA, particularly since EZN was responsible for coordinating with G.E.

### 2.    Best Relied on EZN's Representations and Actions

Best's reasonable reliance on EZN's representations that Best would be permitted to conduct the D& D was based on numerous statements made by Hohn and other EZN management that specifically related to Best being able to control the D & D although the deadline in the SA had elapsed, provided that Best paid the extension fees, which Best did. See, e.g, APP000282, 286. Best did not expect to be able to control the D & D indefinitely but expected EZN to cooperate with Best, as required by the SA, so that Best could complete the D & D in a cost efficient and expeditious manner once all the conditions precedent were in place. That did not happen.

In reliance on EZN's conduct and statements, Best retained Eberhard Fritz on June 12, 2009 to provide technical expertise regarding relocating the production line and agreed to pay Fritz €100 per hour for his services. APP000216-220. Best also arranged for another advisor, Jag Uppal, to travel to Germany for the June 24, 2009 meeting as Uppal spoke fluent German. APP000232, 233, 221.    Uppal

---

that must exist or occur before a duty to perform something promised arises."
*Black's Law Dictionary*, 334 (9th ed. 2009); *see also In re LCS Homes, Inc.*, 103 B.R. 736, 745 (Bankr. E.D. Va. 1989).

remained in Germany for the June 30th meeting as well. APP000242. Best's authorized contractor, Fritz, met with Menuhr for two hours on July 8, 2009 to obtain information needed for his site inspection on July 10th and to complete his status report on the production line. APP000263. Reed forwarded a summary proposal for plant de-activation for EZN's review on July 24, 2009. APP000290, 516. Krish and Reed traveled to Germany to meet with EZN and Fritz on September 4, 2009 to work out the plan for removal of the production line. APP000301. At G.E.'s alleged request, Reed prepared and submitted a detailed project plan incorporating the elements requested by G.E. on September 15, 2009. APP000531-547. Thereafter, G.E. required a detailed survey strategy and plan so Reed prepared and submitted a Radiological Characterization Plan for Surface Contaminated Objects and spreadsheet on October 15, 2009. APP000549-577. Although Best never received any written confirmation on G.E. letterhead, Hohn emailed Best on October 22, 2009 advising that G.E. accepted the plan with a few changes. APP000342, 580.

### 3.    Best Changed Their Position In Reliance on EZN's Statements and Conduct

Best, in reliance on EZN's representations and actions, and reasonably believing that if Best paid €150,000 for a 90-day extension period as required by the SA, Best would continue to have the ability to perform the D & D, Best paid not only paid €150,000 on July 6, 2009 but also paid an additional €50,000 on July

40

23, 2009. APP000603 - ¶33, 604 - ¶43, 649. In addition to making payments to EZN, Best retained the services of Eberhard Fritz on June 12, 2009 to coordinate the D & D project and provide technical expertise. APP000216-220. Fritz developed the production line for Novoste. APP000601 - ¶19, 932, 1059 (Fritz Dep.), lines 3-7. Fritz testified at deposition that he would only be needed to save the production line and that it would be "stupid to pay Fritz and dispose of the production line." APP0001061, lines 14-22. Best agreed to and paid Fritz €100 per hour for his services. APP000632, 220. In total, Best paid Fritz approximately €17,845 for his services between June and December 2009. APP000632. Best continued to try to work with EZN in 2010 and paid Fritz and additional €1,200 for these efforts. APP000632. Best would not have obtained Fritz's services but for EZN's statements and conduct indicating that Best would be permitted to control the D & D provided Best paid EZN €200,000 in extension fees. Additionally, a Best advisor who was fluent in German was dispatched to Germany for the June 24th and June 30th meetings to enhance and accelerate communications between the parties. APP000232, 233, 236, 242.

Moreover, even though the deadline for completing the D & D under the SA, including the 120-day extension period, had passed, Krish and Reed traveled to Germany to meet with Fritz, Hohn and Menuhr on September 4, 2009 to discuss the time schedule, which was to be worked out by Best, and plan for removal of

41

the production line. APP000301. Based on the agreements made during that meeting, Best prepared and submitted two detailed plans for EZN's and G.E.'s approval. APP000529-546, 548-578.

### 4.    Best was Detrimentally Harmed

As a result of EZN leading Best to believe that Best would be permitted to control the D & D although the deadlines had elapsed, Best retained the services of Eberhard Fritz and agreed to pay Fritz €100 per hour for his services. APP000220. Best also sent Uppal to Germany to attend the June 24 and June 30, 2009 meetings because Uppal spoke fluent German. APP000232, 233, 221. Uppal was taken off other projects so that he could focus his abilities on reaching agreement with EZN on the issues that needed resolution so the parties could make progress on the D & D. When subsequent disputes arose, Krish and Reed traveled to Germany to meet with Fritz and EZN on September 4, 2009 so that the parties could reach agreement on how to proceed. APP000301-302. This was well after the extension deadline had elapsed yet EZN encouraged and required Best to "work out a time schedule and plan for removal of the production line." APP000301. Accordingly, Reed spent considerable time preparing the required detailed plans and submitted them to EZN for review and approval. APP000529-546, 548-578.

In addition to the time and money spent to compensate Fritz for his services and traveling to Germany to meet with Fritz and EZN, Best also was harmed in

42

that it lost its valuable production line that was the subject of the D & D obligation, which will seriously impair Best's ability to meet its customers' needs. APP000683, line 6 – 684, line 2 (Reed Dep.), 901-902 (Weingast Dep.) lines 21-22, 1-22, 906-907, lines 7-22, 1-15. Best made it clear from the beginning that it intended to preserve the production line and get it working again. APP000119, 290, 301, 726 (Reed Dep.) lines 7-12. Best owned and had every right to possession of the production line. APP00074, 350, 432, 433-¶15, 976 (Menuhr Dep.) lines 13-18. EZN destroyed the production line to prevent Best from using it to potentially manufacture products that were competitive to EZN's products. The cost to reconstruct the line is at least $3,716,710. APP000630, 1142 (Fritz Dep.) lines 6-22. Instead of decontaminating and decommissioning the production line as required by the SA, EZN opted to destroy it, although Best had complied with all of EZN's and G.E.'s requirements and was prepared to commence the D & D and ship the production line to Georgia.

### C.    DID EZN COOPERATE WITH BEST IN THE PERFORMANCE OF THE D & D OBLIGATION AS REQUIRED BY THE SA?

Interpretation of a contract is a question of law that is reviewed *de novo*. *Palmer & Palmer Co., LLC v. Waterfront Marine Construction, Inc.*, 276 Va. 285, 289, 662 S.E.2d 77, 80 (2008)(internal citations omitted). When a contract is clear and unambiguous, it is the Court's duty to interpret the contract as written. *Id.* In a

breach of contract claim, the contract becomes the law of the case unless it is repugnant to some rule of law or public policy. *Id.* The Restatement (Second) of Contracts §225 (1) (1981) provides that "performance of a duty subject to a condition cannot become due unless the condition occurs or its non-occurrence is excused." A party to a contract is under a duty not to prevent performance by the other party. *In Re LCS Homes,* 103 B.R. 736, 743 (E.D. Va. 1989); *see also, Boggs v. Duncan,* 202 Va. 877, 882, 121 S.E.2d 359, 363 (Va. 1961).

The guiding light in the construction of a contract is the intention of the parties as expressed by them in the words they have used, and courts are bound to say that the parties intended what the instrument plainly declares. *Id.* A contractual term, absent a definition in the contract, is construed according to its usual, ordinary, and popular meaning. *Id.* at 290, 662 S.E.2d at 81. The ordinary meaning of "cooperate" is "to act or work with another or others, to act together or in compliance, to associate with another or others for mutual benefit." The ordinary meaning of "decommission" is to remove from service; the ordinary meaning of "decontaminate" is to rid of contamination. APP000826 (Weingast Dep.) lines 17-21. The ordinary definition of "disposal" relevant to this case means systematic destruction. *See* Merriam-Webster Online Dictionary at www.merriam-webster.com.

Paragraph 3(c) of the SA provides that EZN "shall cooperate fully with Best in the performance of the D & D obligation." APP000447. EZN's cooperation included, but was not limited to, providing Best and its authorized agents and contractors access to the Braunschweig facility when needed, access to personnel within EZN as needed to conduct the D & D and "coordination with the landlord," G.E. APP000447, 760-763 (Reed Dep.) lines 14-22, 1-22, 1-20, APP000764-754, lines 1-22, 1-6. The SA does not permit EZN to decide who will be allowed to have access to the production line nor does the SA permit EZN to refuse to allow Best or its authorized agents or contractors access to the facility when needed or because they do not have an individual confidentiality agreement with EZN. APP000447, ¶3(c). Yet on July 3, 2008 Hohn stated that Pruesse would be permitted to enter the conference room only, thereby obstructing access to Best's authorized contractor. APP000153. Additionally, EZN refused to allow Fritz access to the facility until he had a confidentiality agreement in place, refused to allow Pintaske to assist Fritz when needed, and refused to allow Reed to act as project manager. APP000678 (Request No. 28), 731-732 (Reed Dep.) lines 5-22, 1-21, 862 (Weingast Dep.) lines 12-22, 268, 347. The parties could have included provisions for denying access under various conditions but did not do so and such terms cannot be read in to the parties' contract. EZN's actions constituted a breach of their obligations under the SA.

45

Pruesse had his first contact with G.E. regarding risk assessments on March 13, 2009. APP000188. It was anticipated that Pruesse would receive information regarding G.E.'s rules the following week. APP000188. There is no evidence that EZN contacted G.E. to coordinate the D & D project prior to this date although they were required to coordinate the D & D with their landlord, G.E. APP000447, ¶3(c). On March 16, 2009, G.E. emailed a brief summary of their requirements for the decommissioning work which included a detailed plan with dates and work steps that would need to be evaluated and approved by G.E.; once a plan was approved, a "dates and capacity plan has to be agreed." APP000190.

Thereafter, Best retained Fritz, who designed the line, to provide the necessary technical expertise on the relocation of the production line. APP000216-220, 1074 (Fritz Dep.) lines 11-13. When Fritz started making progress towards commencing the D & D, EZN suddenly advised on July 10, 2009 that he could not begin the D & D without first obtaining Best's written consent. APP000268. This was not required by the parties' contract. To ensure that no progress was made on the D & D, EZN also ordered the lasers that Best's contractor, Gerd Phillips, had disconnected be reassembled. APP000733-734 (Reed Dep.) lines 14-22, 1-15. Gerd Phillips was the laser expert and crucial to Best's D & D efforts. APP0001069 (Fritz Dep.) lines 2-20, 1071 lines 9-13, 1073-1074, line 22, lines 1-22, 1235 (Hohn Dep.) lines 16-20. Menuhr then refused to meet with Fritz on July

15, 2009.  APP000281.  On August 13, 2009, Fritz indicated in an email to Krish that Hohn wanted to enter into an agreement "to replace the points of the settlement agreement" with the actual steps to be done for removal of the production line.  APP000294.

EZN clearly was not happy with the terms of the SA entered into by their predecessor, QSA. The facts show that EZN wanted to modify the terms to (1) require that EZN perform the D & D and earn a profit on the work; (2) require Best to pay €50,000 per month for as long as the production line was in their facility instead of limiting Best's payments to €200,000 as set forth in the SA; and (3) allow them control who could enter their facility.  It should be noted that the €50,000 monthly charge that EZN wanted to impose on Best allegedly for rent EZN was paying to G.E. for the space occupied by the production line actually far exceeded the rent paid by EZN for that space.  According to Joe Hathcock, he viewed the €50,000 figure as liquidated damages based on loss of use and costs incurred for the space. APP0001200 (Hathcock Dep.) lines 24-25, 1201 (Hathcock Dep.) lines 1-7.  The €50,000 figure was based on an average of what EZN estimated they could produce on the site however, the average could differ based upon the use of the space. APP1204 -1205 (Hathcock Dep.), lines 20-25, 1-25, respectively.  The actual lease cost for the space that the Best production line occupied was €6,900 per month. APP0001206, line 14 to 1208, line 19 (Hathcock

Dep.). Additionally, EZN tried to get Best to agree to pay €50,000 per month during the time the D & D was being completed. APP000230, 245, 251, 343, 362-364. According to EZN, the cost to decommission the production line included factory overhead of 187% (APP000633) which according to Hathcock included facility costs. APP0001192 (Hathcock Dep.) lines 12-22. This is just another example of EZN attempting to profit from this transaction at Best's expense. It was EZN's unreasonable demands for payment of monies that were not contracted for that prevented Best from completing the D & D. APP0001113 (Fritz Dep.) lines 2-20.

On September 23, 2009, when Fritz attempted to have Pintaske act as a second consultant, EZN refused to allow Pintaske access to the facility although the SA does not give EZN the right to do so. APP000268. Pintaske was a crucial part of Best's D & D efforts since he was the dosimetry expert and built the measurement and classification box of the production line. APP0001069-70 (Fritz Dep.) lines 21-22, 1-12 and 1073-1074, line 22, lines 1-22. It was not until October 22, 2009 that the parties had worked out the details regarding how to complete this complicated project and EZN allegedly obtained the necessary approval from G.E. APP000342. The only thing left to do was schedule the workers. Instead, EZN began **"working on making it more difficult"** for Best to complete the D & D. APP000347. First, EZN required Fritz to be the full-time

supervisor although they knew he was committed to other projects at that time. APP000350-351, 339. There is no provision in the SA that permits EZN to dictate who supervises the D & D on behalf of Best. At the same time, contrary to the terms of the SA, EZN refused to allow either Pintaske or Reed to supervise the D & D although they knew that Fritz was not available due to other commitments. APP000268, 347. EZN prevented Best's authorized contractors and agents from accessing the facility when needed in violation of ¶3(c) of the SA. APP000447. Additionally, although Hohn indicated in his October 22, 2009 email that their proposal to complete the work for not more than €400,000 remained open and just needed to be signed (APP000342), EZN forwarded a proposal for the D & D dated November 11, 2009 that required five full-time EZN employees to be assigned to the project and required Best to pay these workers **€276 per hour per worker,** eight hours per day for 12 weeks for a total of over €600,000. APP000350-351. These workers were lab technicians. APP000350-351. These actions were designed to (1) prevent Best from timely commencing the D & D now that G.E. approval had allegedly been obtained; and (2) make the costs of saving the production line so unreasonably high that Best would be unable to afford to save the technology. Additionally, EZN had financial incentive to draw out the time it took to remove the production line as they expected to be able to collect €50,000 per month from Best for as long as the production line remained at their facility.

These actions violated ¶3(c) of the SA.  If EZN had truly wanted to get the production line out of its facility in the fastest possible manner as they claimed, all they had to do was allow Pintaske or Reed to supervise the work, as they were required to do under the terms of the SA, and honor their prior agreement to do the work for an amount not to exceed €400,000.  Although the SA required EZN to cooperate with Best in completing the D & D, EZN's desire to obstruct Best from completing the D & D and their desire to destroy the production line stems from the fact that EZN and Best are competitors in the field of radiopharmaceutical devices. APP0001283 (Hohn Dep.), lines 17-23.   EZN had no incentive to assist Best in saving the technology and likely never intended to let Best have its production line.  EZN repeatedly created obstacles that made it impossible for Best to commence the D & D and to save the production line.   APP000873-874 (Weingast Dep.) lines 16-22, 1-10; see also, APP000886-887 (Weingast Dep.) lines 2-22, 1-9.  Every time Best would agree to terms with EZN, EZN would change the terms or say it was too late. EZN benefitted from this in that they financially harmed a competitor and obtained €300,000 in payments from Best for which Best received nothing in return.  APP000683, line 6 – 685, line 2 (Reed Dep.).  EZN's actions speak louder than their words.

### D.    COULD BEST BE IN DEFAULT WHEN G.E. HAD NOT APPROVED THE D & D PLANS AND THE D & D COULD NOT COMMENCE WITHOUT SUCH APPROVAL?

A condition precedent is an act or event which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises. *Gross v. SES Americom, Inc.,*213 Fed. Appx. 166, 169 (4th Cir. 2007)(internal citations omitted).

It is beyond dispute that Best did not have control over coordinating the D & D with G.E. APP000447, ¶3(c). Accordingly, Best could not be in default for failure to complete the D & D by April 16, 2009 or within the four extension periods when approval was not obtained from G.E, if it was obtained at all, until October 22, 2009. APP000342. EZN has produced no written documentation evidencing G.E.'s written approval of the plans for the D & D or the plan for the radiological surveys so Best has no way of knowing if G.E. ever actually approved the plans. The evidence shows that G.E. approval had to be obtained before the D & D process commenced and that the timing of the D & D was dependent on G.E. being available to oversee the work. APP000152, 188, 189, 190, 199, 205, 242, 313, 324, 325, 330, 334, 342.

Although Best disputed that it owed fees for extensions, Best paid the extension fees despite the fact that no plans for the D & D had been agreed to by EZN or G.E. Best's inability to complete the D & D by April 16, 2009 was largely due to EZN's failure to cooperate with Best and the length of time it took to obtain the necessary approvals from G.E., both of which were EZN's obligations under

51

¶3(c) of the SA.  APP000447, ¶3(c). Therefore, Best could not have been in default prior to the time G.E. approval was obtained as this was a condition precedent to commencement of the D & D.

### E.    DID THE SA REQUIRE EZN TO PROVIDE BEST WITH IN SPECIFICATION SOURCE TRAINS?

Paragraph 2 of the SA specifically states that for the purpose of this agreement, "Sources and Sources Trains shall refer to radioactive Sources and Source Trains manufactured by QSA under the SMA." The SMA, ¶1.28, defines Source Trains as "a set of Sources...in varying lengths...meeting the Specification suitable for use in the Medical Device." APP000462-463. "Medical Device" is defined as Novoste's Beta-Cath™ System. APP000462, ¶1.18. The SMA further obligated EZN's predecessor to provide evidence that the Source Trains were produced and tested in compliance with the specification and all applicable laws of Germany, the European Union, and the U.S. APP000469-470, ¶7.3, APP000691 (Reed Dep.) lines 11-18.  In the event a batch of Source Trains did not meet the specifications, the SMA required the discovering party to communicate in writing with the other party to determine a mutually agreed course of action. APP000476, ¶10.2.  Accordingly, Hugh Evans wrote to Best advising that the Source Trains were not in specification on June 27, 2008.  APP000144.  EZN's obligation for Source Trains that did not meet specifications under the SMA was to (1) replace the Source Trains at EZN's costs; (2) reimburse Best for any costs in returning the

Source Trains and for any purchase price paid by Best for the Source Trains; and (3) indemnify Best for any other costs incurred by Best by reason of the out-of-specification Source Trains. APP000476, ¶10.2. EZN's position was that Best was obligated to pay €100,000 for unusable product. APP0001170 (Reed Expert Dep.) lines 3-7. This position is contrary to the express wording of paragraph 2 of the SA. APP000446, ¶2, 1145 (Reed Expert Dep.) lines 3-12 and 1159 lines 1-14.

There is no provision in the SMA or the SA that relieves EZN from complying with the specifications. To the contrary, the SMA provides that EZN warrants the Source Trains will be free from defects in material and workmanship for one year from date of delivery to Best. APP000479, ¶14.2. The SA provides that because Best is only obligated to purchase minimum inventory stock and in recognition of the fact that there may not be sufficient stock to manufacture trains in the lengths Best may prefer, that EZN will only "attempt to satisfy Best's preference, subject to available quantities of each size Source Train." Regardless of the length of the train, however, there is nothing in the SA that obligates Best to accept out-of-specification Source Trains. Moreover, pursuant to the SMA, Best is entitled to be refunded or credited for the €100,000 Best paid pursuant to ¶2 of the SA for Source Trains that were to be manufactured by EZN under the SMA but were never received by Best. APP000446, ¶2.

Significantly, the SA provided that EZN was obligated to accept for disposal from Best any sources or Source Trains that were manufactured under the SMA. APP000449, ¶4. If Best had accepted the out-of-specification Source Trains, Best could have returned them under ¶4(b) of the SA, but would have incurred the shipping costs to Norcross, Georgia and from Norcross, Georgia to back to Braunschweig, Germany and EZN would have incurred the costs of providing the appropriate transportation containers. APP000450, ¶4(b). In other words, EZN would have ended up with the out-of-specification Source Trains and been required by the terms of the SA to dispose of them. APP000449-450, ¶4. Accordingly, EZN's argument that Best had to accept the sources and Source Trains even if they were not within specifications defies logic and was not the intent of the SA.

## F.    DID EZN HAVE THE RIGHT TO DESTROY BEST'S PRODUCTION LINE?

The court's primary focus on an issue of contractual interpretation is to ascertain and give effect to the intent of the parties. *See Pocahontas Mining Ltd. Liab. Co., v. CNX Gas Co., LLC*, 276 Va. 346, 666 S.E.2d 527, 531 (Va. 2008). The intent of the parties as expressed in their contract controls. *See Bender-Miller Co v. Thomwood Farms, Inc.*, 211 Va. 585, 179 S.E.2d 636, 639 (Va. 1971). It is the court's responsibility to determine the intent of the parties from the language they employ. *See Bender*, 179 S.E.2d at 639 (citing *Seaboard Air Line R.R. Co. v.*

54

*Richmond-Petersburg Turnpike Auth.*, 202 Va. 1029, 121 S.E.2d 499, 503 (Va. 1961)). Where the agreement is plain and unambiguous in its terms, the rights of the parties will be determined from the terms of the agreement. *See Harris v. Woodrum*, 3 Va. App. 428, 350 S.E.2d 667, 669, 3 Va. Law Rep. 1177 (Va. Ct. App. 1986). The law abhors forfeiture and contractual provisions for forfeiture are looked upon with disfavor by the courts. *RW Power Partners, L.P. v. Virginia Electric and Power Co.,* 899 F. Supp. 1490, 1496 (E.D. Va. 1995) *citing Galvin v. Southern Hotel Corp.,* 154 F.2d 970, 973 (4th Cir. 1946)(internal citations omitted).

In this case, there is no case law or contractual authority that gave EZN the right to destroy Best's production line. There is also no dispute that Best owned the production line. APP00074, 236, 459, 730 (Reed Dep.) lines 8-14. EZN destroyed the production line out of animosity towards Best arising from the parties prior litigation and to prevent Best from using it to manufacture competitive products.

EZN asserted that they had the right to destroy Best's property if Best defaulted in the D & D obligation but cited no SA provision or law that supported that claim, nor could they do so. APP000639, Interrogatory No. 2. The SA, ¶3(e)(iii) provides that if Best defaults, EZN "shall have the right to complete the D & D Obligation using commercially reasonable efforts." APP000448, ¶3(e)(iii). The SA gives EZN the right to take the production line out of service and to

55

decontaminate it, but does not give EZN the right to destroy it or otherwise deprive Best from obtaining possession of its property.    APP000448,  ¶3(e)(iii). Nevertheless, EZN proceeded to destroy the production line which caused Best to be damaged in an amount equal to at least $3,716,710.00.  APP000630-631, see photographs at 1171-1175, 1220-1227.

## VII.  CONCLUSION

EZN holds the production line in a constructive trust because they do not have any rights to possession of the production and do not own the production line. Best wants its production line if any useful part of it remains. In addition, Best seeks to recover $3,716,710.00 to rebuild the production line, the €100,000 Best paid to EZN for in specification Source Trains that EZN never provided, €200,000 in extension fees that were paid in good faith although the D & D could not have been performed because G.E.'s approval had not been obtained, and €19,045 to Fritz.  In the alternative, Best prays that this case be remanded to the District Court and that Best be permitted to proceed to trial in this matter or for such other relief as the Court deems just and necessary in this matter.

**ORAL ARGUMENT IS REQUESTED.**

Respectfully submitted,

By:    /s/ James M. Brady
       James M. Brady

56

Virginia State Bar No. 80002
*Counsel for Plaintiffs-Appellants*
Best Medical International, Inc.
7643 Fullerton Road
Springfield, VA 22153
Telephone: (703) 451-2378
Facsimile: (703) 451-8421
Email: james@teambest.com

## CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) OR 32(a)

This brief complies with the type-volume limitations of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because this brief contains 13,741 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in Times New Roman 14 point font.


DATED: JANUARY 17, 2012          /s/ James M. Brady,
                                 Attorney for Plaintiffs-Appellants

## CERTIFICATE OF SERVICE

I hereby certify that on JANUARY 17, 2012, I electronically filed the foregoing document with the Clerk of the Court for the Fourth Circuit Court of Appeals using the electronic case filing system of the Court. The electronic case filing system will send notification of such filing to all counsel of record. Counsel may access such document using the Court's system.

/s/ James M. Brady
James M. Brady
Virginia State Bar No. 80002
*Counsel for Plaintiffs/Appellants*
Best Medical International, Inc.
7643 Fullerton Road
Springfield, VA 22153
Telephone: (703) 451-2378
Facsimile: (703) 451-8421
Email: james@teambest.com

Dated:  JANUARY 17, 2012.